Simon Mackay v. Commissioner.
Mackay v. Commissioner
Docket No. 2980.
United States Tax Court
1945 Tax Ct. Memo LEXIS 125; 4 T.C.M. (CCH) 764; T.C.M. (RIA) 45237; June 30, 1945
*125 Ralph E. Tibbetts, Esq., 10 Post Office Square, Boston, Mass., for the petitioner. Charles P. Reilly, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: This case involves an income tax deficiency for 1939 of $8,639.12. The sole issue is whether the gain realized by petitioner on disposition of 600 shares of preferred stock is a short-term capital gain, which is 100 percent taxable, or a long-term capital gain, only 50 percent of which is taxable. The case was presented on stipulated facts and documentary evidence introduced without objection at the hearing. The other findings of fact are from the exhibits. Findings of Fact The stipulated facts are found as stipulated, and the pertinent portions thereof are herein set forth. The petitioner is a resident of Athol, Massachusetts. His return for the period involved was filed with the collector of internal revenue of the Boston district. During the taxable year petitioner was a director and vice-president of the Union Twist Drill Company, hereinafter referred to as Union, a corporation with its place of business in Athol, Massachusetts. From 1920 to May 12, 1939, petitioner *126 owned 600 shares of 7 percent cumulative preferred stock of Union which had a cost basis in his hands of $26,280. On or about December 31, 1919 Union amended its charter to provide for the issuance of 31,296 shares of the aforesaid preferred stock and for the issuance of 200,000 shares of common stock. All of the preferred stock was subsequently issued. Pertinent provisions of Union's charter, as amended with respect to its preferred stock, read as follows: "B. After all dividends accrued on the preferred stock have been paid or declared and set aside for payment, the corporation out of the balance of its net profits or surplus, or out of other funds available therefor, shall deposit with the transfer agent as a preferred stock sinking fund instalment on or before the first day of May, 1921, and on or before the first day of May in each year thereafter, an amount equal to whichever is greater of the following, viz: (a) ten (10) per centum of the net profits of the corporation for the fiscal year next preceding, determined as hereinafter provided, which remain after deduction of the dividends accrued on the preferred stock, or (b), two (2) per centum of the maximum aggregate par *127 value of preferred stock which at any time shall have been outstanding. The corporation may at any time deposit with the transfer agent any amount in anticipation of future sinking fund instalments, and any amount so deposited shall be credited upon any future sinking fund instalment designated by the corporation. "All cash so deposited with the transfer agent shall on or before the first day of July next following be applied as may be determined by the board of directors either to the purchase by the transfer agent of preferred stock in the open market at not more than the call price thereof, or to the call of preferred stock under the provisions below contained. Interest accruing on any moneys in the sinking fund shall be added to such fund. Preferred stock in the sinking fund including anticipations of future instalments shall be stamped with a notation that the same is held in the sinking fund, shall not be re-issued or in any way disposed of or encumbered, shall not be considered outstanding or entitled to vote or to receive dividends, and shall be retired and canceled by a reduction of the capital stock of the corporation when authorized by the corporation. "All or any part *128 of any such sinking fund instalment or deposit in anticipation of future instalments may at the option of the corporation be constituted of or applied to the purchase of preferred stock previously purchased by the corporation taken at the price paid therefor by the corporation, or at its fair market value as determined by the transfer agent, whichever is less, and in no case at more than the call price thereof. * * * * *
"The net profits and surplus of the corporation available at any time for the payment of dividends upon any junior stock shall be deemed to have been diminished by all amounts whether in cash or preferred stock which the corporation, pursuant to the foregoing provisions, shall have deposited with the transfer agent in the sinking fund. But this provision shall not apply to the payment on any junior stock of a dividend payable in any junior stock. * * * * *
"C. After all dividends accrued and the accruing dividends on the preferred stock have been paid or declared and set aside for payment, and after all accrued sinking fund instalments above provided for have been deposited with the transfer agent and a ratable proportion of the estimated accruing sinking *129 fund instalment has been set aside, but not otherwise, dividends upon any junior stock may be declared by the board of directors out of the balance of the net profits or surplus, subject, nevertheless, to the provisions hereinafter in these articles contained. "D. In case of liquidation or dissolution the preferred stock shall receive one hundred and ten (110) dollars a share if such liquidation or dissolution be voluntary and one hundred (100) dollars a share if it be involuntary, plus in either case dividends accrued to the day of payment and all accumulated dividends, if any, before any payment is made upon any junior stocks, and the remaining assets shall be distributed among holders of the junior stocks alone. "E. By vote of the board of directors or of the stockholders entitled to vote thereon, all or any part of the preferred stock at any time outstanding may be called for purchase by the corporation in the manner hereinafter provided on any dividend day at the following call price, viz: one hundred and ten (110) dollars a share, together with the dividends accrued on the dividend day for which the call is made, and all accumulated dividends, if any. In case less than all *130 the outstanding preferred stock is so called, the transfer agent shall determine by lot the stock to be called, but at any time when more than one class of preferred stock is outstanding, the lot shall be restricted to such class or classes as may be designated by the corporation. No call of less than all the outstanding preferred stock shall be made while any dividends accumulated on the preferred stock remain unpaid. The sums payable in respect of the stock so called shall be payable at the office of the transfer agent. Notice of such call, stating the dividend day for which the call is made and the place where the stock so called is payable, shall not less than thirty days prior to the dividend day for which the call is made, be mailed to each holder of stock so called at his address as it appears upon the books of the corporation. The corporation shall, at least three business days before said dividend day, deposit with the transfer agent all sums payable in respect of the stock so called. After such notice and deposit all stock so called shall be deemed to have been redeemed and the holders of the certificates therefor shall cease to have any rights to future dividends or other *131 rights or privileges as stockholders in respect of such stock, and shall be entitled in respect of their certificates only to the payment of the sums so deposited with the transfer agent for their respective accounts. Stock so redeemed may be re-issued but only subject to the limitations imposed by these articles upon the issue of preferred stock. * * * * *
"H. The corporation shall not directly or indirectly do any of the following things without the written consent of the holders of seventy-five (75) per centum of the preferred stock then outstanding, viz: * * * (9) issue any preferred stock (whether of the class now authorized or of any other class as aforesaid) after the first three million one hundred twenty-nine thousand six hundred (3,129,600) dollars to be issued, unless (a) the average annual net profits of the corporation for the three fiscal years then last preceding, determined as hereinafter provided, shall have been at least two (2) times the annual dividend requirements on the preferred stock outstanding and that to be issued; and (b) the net quick assets of the corporation as hereinafter defined shall after the issue of such stock be equal to at least one hundred *132 twenty-five (125) per centum of the aggregate par value of the preferred stock outstanding and that to be issued, and (c) the net assets of the corporation, determined as hereinafter provided, shall after the issue of such stock be at least equal to two hundred (200) per centum of the aggregate par value of the preferred stock outstanding and that to be issued; * * *" The State Trust Company, Boston, Massachusetts, hereinafter referred to as Trust Company, was the transfer agent of Union and also the trustee of a sinking fund for preferred stock. The transfer department of the Trust Company acted as transfer agent for Union and the corporate trust department as trustee of the sinking fund. On May 12, 1939 the Trust Company, acting as agent of Union, acquired from the petitioner his 600 shares of preferred stock of Union, paying over to him therefor the sum of $66,490 being at the rate of $110 a share, plus accrued and unpaid dividends thereon as of May 12, 1939. The petitioner was a director of Union and had knowledge prior to May 12, 1939, that there was to be a directors' meeting on May 16, 1939, at which it was to be voted that Union should redeem all the outstanding preferred *133 stock as of July 1, 1939, paying therefor $110 per share plus accrued and unpaid dividends. The aforesaid meeting of the directors of Union was held on May 16, 1939 and the following vote was passed: "Voted: To call for redemption all of the outstanding preferred stock of this company, such redemption to take place on July 1, 1939 at the office of the State Street Trust Company, City of Boston, Commonwealth of Massachusetts, Transfer Agent of the stock of this Company, and that the redemption price of said stock shall be One Hundred and Ten Dollars ( $110.) a share, with accrued dividend to the date set for redemption." At the annual stockholders' meeting of Union held on February 13, 1940, the following vote was passed: "Voted: To amend the Articles of Organization of the corporation as heretofore amended by eliminating the authorized preferred stock compromising 31,296 shares, all of which has been heretofore issued, and by eliminating all provisions concerning such preferred stock as set out in said Articles as amended, said decrease to be accomplished by cancelling the 31,296 shares of preferred stock which have been acquired by the corporation for sinking fund requirements *134 or by redemption." On April 9, 1926 the corporate trust department of the Trust Company as trustee for the sinking fund of Union preferred stock, held 4,302 shares thereof, the certificates for which stood in the name of "Union Twist Drill Company Preferred Stock Sinking Fund". The certificates representing these 4,302 shares bore the following legend: "The shares represented by this certificate are held in the sinking fund for preferred stock of this company and are not entitled to dividends and can not be re-issued and no stock can be issued in lieu thereof or in exchange therefor." Subsequent to April 9, 1926 the trustee from time to time acquired shares of preferred stock of Union which it continued to hold in negotiable form against sinking fund requirements. No transfer to the sinking fund was made of such shares on the books of the transfer agent. As of January 1, 1939 the trustee held 7,738 shares which were to be used only for sinking fund purposes. On March 21, 1939 the trustee acquired 626 additional shares; no other certificates for sinking fund purposes were received by the trustee after March 21, 1939. Over a period of years the transfer department of the Trust *135 Company, acting on instruction from Unison, had purchased shares of preferred stock of Union offered to it. On January 1, 1939 the transfer books showed 20,475.6 shares of the preferred stock outstanding in the name of Union. Between January 1, 1939 and May 12, 1939 the transfer department acquired 663 shares of Union preferred stock, 600 shares of which were acquired from the petitioner. The Trust Company acted as agent for Union in taking up all remaining outstanding stock called for redemption as of July 1, 1939. New certificates were issued to Union for the certificates purchased as of July 1. All certificates of stock so purchased were retained for safe keeping by the Trust Company as agent of Union. The transfer books showed all preferred stock as still issued and outstanding in the name of Union until February 26, 1941, when all preferred stock previously acquired was canceled and retired in accordance with the stockholders' vote passed February 13, 1940. None of the shares of preferred stock transferred into the name of Union was ever reissued in any other name. In his income tax return for 1939 petitioner treated the acquisition of the 600 preferred shares by Union as *136 a sale and reported a longterm capital gain, one-half of which, or $20,105, he took into account for tax purposes. In his notice of deficiency the Commissioner treated the transaction as a partial liquidation and included in the entire gain of $40,210 in petitioner's taxable income as a short term taxable gain. The acquisition by Union of 600 shares of its preferred stock from petitioner constituted a distribution in partial liquidation. Opinion The basic question in this type of cse is the intent of the corporation in acquiring the stock. If the corporation purchased the stock with the intent to hold it as treasury stock subject to resale no partial liquidation resulted from the acquisition. But if the corporation acquired the stock with the intent of canceling and retiring it, then a partial liquidation occurred. , and cases there cited; , promulgated March 7, 1945. The Commissioner contends that the transaction in question was a distribution in partial liquidation because (1) Union intended to cancel and redeem all its preferred stock at the time it acquired petitioner's shares on May 12, 1939; *137 (2) Union's directors voted on May 16, 1939 to redeem all of its preferred stock; and (3) Union's stockholders voted on February 13, 1940 to retire the preferred stock after the same had been acquired by the corporation for sinking fund purposes and by redemption. Petitioner contends that his 600 shares were not acquired by Union for sinking fund purposes or in anticipation of sinking fund requirements. He contends that Union acquired his stock long before the plan of partial liquidation was adopted by Union's stockholders on February 13, 1940, that prior thereto no such plan existed and therefore the transaction of May 12, 1939 could not have been a step in consummation thereof. He further contends that Union acquired his stock and held it as treasury stock and that even if the directors did adopt a plan of partial liquidation by their vote on May 16, 1939, his knowledge of the step to be taken did not alter the character of the sale as a long-term capital transaction. We are not persuaded by petitioner's evidence or argument that the Commissioner erred. Inherent in the Commissioner's determination of the deficiency herein is his determination that Union acquired petitioner's *138 shares with the intent of canceling and retiring them. This places the burden upon petitioner of proving that the shares were not so acquired. In our opinion petitioner has failed to carry his burden. Union's intent can be ascertained from the provisions written into its charter respecting its preferred stock issue and from Union's conduct over a period of years under these charter provisions. Clearly thereunder Union intended to completely retire its preferred stock issue within fifty years. The mandatory requirements of the preferred stock sinking fund assures the retirement within this period. However, it seems equally clear that Union also intended an earlier retirement of its preferred stock issue, if earnings permitted. Its charter specifically provided that Union "may at any time deposit with the transfer agent any amount in anticipation of future sinking fund instalments"; it further provided that "any amount so deposited shall be credited upon any future sinking fund instalments designated by the corporation [Union]". This record indicates that numerous anticipatory purchases were made from time to time by Union's agent prior to January 1, 1939. By the latter date Union *139 held in its own name, by virtue of these anticipatory purchases, 20,475.6 shares out of 31,296 authorized shares of its preferred stock. In addition the trustee of its sinking fund held 4,302 shares of preferred stock which shares, the taxpayer admits, were, for all practical purposes, retired. During 1939 and prior to May 16, 1939 Union acquired 663 additional shares of its preferred stock. It is significant, we think, of Union's intent that none of the preferred shares that it acquired was ever re-issued, and of course, Union's charter prohibited the reissuance of any of the 4,302 shares held by the trustee of the sinking fund. This resume of the facts brings us down to the situation that confronted petitioner on May 12, 1939. At that time Union held in its own name 20,538.6 shares of its preferred stock, the trustee of its sinking fund held 4,302 shares, and the remaining shares were held by Union's stockholders. Petitioner held 600 of these remaining shares on May 12. It is stipulated that he knew prior thereto that the directors would vote on May 16 to call all outstanding shares for redemption on July 1, 1939. His 600 shares would obviously be included in the call. With this *140 knowledge he transferred his 600 shares to Union for the call price thereof plus accrued dividends to May 12, 1939. As a director and officer of Union petitioner must have been aware of the charter provisions respecting the preferred stock and the large volume of anticipatory purchases made by Union in the open market over a period of years without the reissuance of a single share thereof. While it is immaterial whether or not petitioner was "entirely without information" as to Union's intent, , the record here shows that he did know Union's intent and its purpose in acquiring his stock. Subsequent events corroborate the intent of Union to retire the preferred stock issue. At the first annual meeting of stockholders after the directors called its preferred stock for redemption, provision was made by the stockholders for the retirement and cancellation of all the preferred stock. The circumstances under which the preferred stock was issued and the manner in which the stock was reacquired, prove to our satisfaction that by May 12, 1939, if not before, Union had definitely determined to completely retire its preferred stock issue. We believe *141 that the facts here justify the inference that petitioner knew of this policy and sought to benefit himself tax-wise by disposing of his shares prior to the call for redemption. But since Union acquired the stock with the intent to complete the cancellation or redemption of its entire preferred stock issue, the amount received by petitioner was an amount distributed in partial liquidation under section 115(i) of the Code. It follows that the gain realized from the transaction is a short-term capital gain under section 115(c) of the Code. , is distinguishable on its facts. True Hobby sold to others after notice of the call for redemption, but he did not sell his stock to the issuing corporation. He sold to third parties and this Court held, with four dissents, that the sales were bona fide despite his knowledge that the shares would shortly be redeemed. Here petitioner knew that the shares would shortly be called for redemption by vote of Union's directors. He also knew that for many years Union had been buying its preferred stock on the open market. Had petitioner sold to a third party the case would be very similar to the Hobby case. But petitioner *142 sold to Union, and by so doing brought section 115(c) and (i) of the Code into play. Decision will be entered for the respondent.